# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 21-1559V
UNPUBLISHED

| | |
|---|---|
| WILLIAM L. MILLER,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: February 10, 2023<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain<br>and Suffering; Influenza (Flu)<br>Vaccine; Guillain-Barre Syndrome<br>(GBS) |

*Kimberly Wilson White*, Wilson Law, P.A., Raleigh, NC, for Petitioner.

*Amanda Pasciuto*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On July 9, 2021, William L. Miller filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") which meets the Table definition for GBS or which, in the alternative, was caused-in-fact by the influenza ("flu") vaccine he received on January 4, 2020. Petition at 1, ¶¶ 3, 62, 67. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. After Respondent conceded entitlement, the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] For approximately three weeks, the parties attempted to reach an informal agreement regarding damages, but were unable to agree upon the amount related to Petitioner's pain and suffering. *See* Informal Remark, dated Apr. 14, 2022.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount **$158,027.98, representing $155,000.00 for actual pain and suffering (but with no future component), and $3,027.98 for past out-of-pocket expenses.**

**I.   Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of*

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were

2

*Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

## II. Factual History

Petitioner was at the time of vaccination a 76-year-old, retired professor who exercised regularly and played tennis on a competitive senior team. Exhibit 2 at 9-23; Exhibit 6 at ¶¶ 2, 5. He previously suffered common conditions and disease – such as gastrointestinal disease, a surgically repaired left shoulder rotator cuff tear, and prostate cancer. Exhibit 2 at 9-23.

Approximately one-week post-vaccination, Petitioner began to experience tingling and numbness in his feet and legs when walking on the bathroom floor – but a stable gait, a feeling of coldness in his legs, and some difficulty sleeping. Exhibit 2 at 7. During a January 14, 2020 visit, his primary care provider ("PCP") observed no evidence of neurologic defects or GBS, but cautioned that Petitioner may be experiencing a "very mild form of GBS." *Id.* He instructed Petitioner to follow-up with a neurologist if his symptoms continued. *Id.*

When seen again by his PCP on January 17th, Petitioner described the same symptoms, along with generalized myalgia which exacerbated his inability to sleep. Exhibit 2 at 4. However, he reported no falls and an ability to get up and move within 12 seconds. *Id.* Noting that Petitioner exhibited normal deep tendon reflexes and strength, his PCP again ruled out GBS – adding that he was hopeful Petitioner's symptoms were "a transient reaction to recent immunizations [which] will resolve without intervention over the coming week." *Id.* at 5. He prescribed Tramadol[5] to help Petitioner sleep. Exhibit 2 at 5.

The next day – on January 18th, Petitioner visited the emergency room ("ER"), complaining of a worsening of his previous symptoms and additional conditions: right facial drooping and an inability to close his eyes or move his nose, characterized as classic Bell's Palsy symptoms. Exhibit 3 at 317, 322. In his affidavit, he indicated that he had "collapsed in [his] home and could hardly walk." Exhibit 6 at ¶ 10. The ER physician opined "there [wa]s nothing to suggest acute stroke," included transverse myelitis ("TM")

---

assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain following surgical procedures and oral surgery, administered orally. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1950 (32th ed. 2012).

and GBS as differential diagnoses, admitted him to the hospital for a neurologic consult, and prescribed Valtrex[6] and prednisone.[7] Exhibit 3 at 322.

Although some test results were normal, a brain MRI was consistent with Bell's Palsy, and a lumbar puncture revealed elevated protein levels. Exhibit 3 at 320-322, 630-636. Seen by a neurologist the next day, Petitioner was diagnosed with acute inflammatory demyelinating polyneuropathy ("AIDP") – a common form of GBS. *Id.* at 389. Noting that he was critically ill and in danger of decompensation to include possible respiratory compromise, the neurologist ordered Petitioner transferred to intensive care[8] and prescribed plasmapheresis. Exhibit 3 at 389-90.

To assist with plasmapheresis, a PICC[9] line was inserted into Petitioner's left internal jugular, after attempts in the right jugular proved unsuccessful. Exhibit 3 at 444. A Foley catheter also was insisted to measure urine retention. *Id.* at 367. Petitioner received five courses of plasmapheresis from January 19th - 27th. *Id.* at 1035.

By January 20th, Petitioner's swallowing and cough were described as adequate, and his risk of aspiration was characterized as mild. Exhibit 3 at 363-64. After two plasmapheresis treatments - on January 22nd, it was noted that Petitioner's weakness had not progressed. *Id.* at 517. Although he was hallucinating – seeing rain in the room and his son's beard growing, Petitioner reported that he was better and had slept well for the first time in eight days. *Id.* at 509-10. On January 28th - the day before his discharge to inpatient rehabilitation, Petitioner was noted to have met all swallow and speech goals, and to be making substantial progress towards his occupational therapy goals. *Id.* at 453-55. He simulated using the toilet and taking a shower - requiring only one verbal safety reminder. *Id.* at 454-55. Petitioner was discharged to inpatient rehabilitation on January 29, 2020.

Upon his arrival at the inpatient rehabilitation facility, Petitioner was assessed as being able to make his needs known to the staff, ambulating without assistance, and being without pain. Exhibit 5 at 93. Bruising was observed on his left neck from the PICC

---

[6] Valtrex, known by its generic name – Valacyclovir, "is used to treat infections caused by certain types of viruses. . . . In adults, it is used to treat shingles (caused by herpes zoster) and cold sores around the mouth." https://www.webmd.com/drugs/2/drug-14126/valtrex-oral/details (last visited Feb. 9, 2023).

[7] Prednisone is "a synthetic glucocorticoid derived from cortisol, administered orally in replacement therapy for adrenocortical insufficiency and as an anti-inflammatory and immunosuppressant in a wide variety of conditions." DORLAND'S at 1508.

[8] The medical records specifies that Petitioner was to be transferred to the NICU, standing for neonatal intensive care unit. Exhibit 2 at 390.

[9] PICC stands for "peripherally asserted central catheter." MEDICAL ABBREVIATIONS at 468 (16th ed. 2020).

line and on his right arm from a blood draw. *Id.* Throughout his two-day stay, he was described as exhibiting even and non-labored breathing, no difficulty chewing or swallowing, and able to ambulate independently with a steady gait. *Id.* at 94. He was discharged on January 31st. *Id.*

At a February 6th visit to the neurologist, Petitioner reported continued leg pain for which he took Gabapentin,[10] an inability to completely close his right eye, and "some pain, swelling, and redness in the LUE[11] since his hospitalization." Exhibit 4 at 7. Noting that he was sleeping much better, he theorized that the hallucinations he experienced during his hospitalization were due to his lack of sleep. *Id.* He was observed to have a normal gait and ability to perform a toe walk, but not heel or tandem. *Id.* at 10. The same day, Petitioner was seen by a vascular surgeon who diagnosed him with deep vein thrombosis ("DVT") - caused by his left jugular catheter, and prescribed Eliquis.[12] Exhibit 3 at 245. After a reaction to this medication caused dizziness - precipitating a visit to the ER two days later, Petitioner's Eliquis was replaced by Xarelto.[13] Exhibit 3 at 57.

When next seen by his PCP (February 12, 2020), Petitioner reported a resolution of his lower extremities pain and coldness, but continued facial weakness and symptoms of DVT. Exhibit 2 at 2. Indicating that, due to his physical therapy ("PT"), he was gaining strength and only slightly limited in his ability to heel walk, he asked if he could discontinue Gabapentin. *Id.*

Petitioner continued to report no pain during PT, occupational therapy, and speech therapy sessions in February through early March. *See generally* Exhibit 5. He was noted as meeting all goals on discharge sheets completed March 6th. *Id.* at 299, 329, 341. He was described as "able to jog for 3 minutes with only mild fatigue, able to converse fully" (*id.* at 299) and "exhibit[ing] little to no functional deficits" (*id.* at 329). However, he "continue[d] to present with minimal, at times mild, dysphonia c/b decreased sustained phonation, decreased loudness, . . . pitch, [and] range, and hoarse vocal quality." *Id.* at 341.

---

[10] "Gabapentin works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system. It is not used for routine pain caused by minor injuries or arthritis. Gabapentin is an anticonvulsant." https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited Feb. 8, 2023).

[11] LUE stands for left upper extremities. MEDICAL ABBREVIATIONS at 353.

[12] Eliquis – known by its generic name – Apixaban, "is used to prevent serious blood clots from forming" due to multiple conditions, including DVT. https://www.webmd.com/drugs/2/drug-163073/eliquis-oral/details (last visited Feb. 9, 2023).

[13] Xarelto – known by its generic name – Rivaroxaban, "is used to prevent . . . blood clots (such as in deep vein thrombosis-DVT." https://www.webmd.com/drugs/2/drug-156265-1153/xarelto-oral/rivaroxaban-oral/details (last visited Feb. 9, 2023).

Although reporting the same improvement in symptoms as communicated to his PCP in early February, at his March 10th visit to the neurologist, Petitioner clarified that he continued to feel some clumsiness and symptoms of DVT – including tingling in his hands, a feeling of a balloon in his left shoulder, and inability to sleep on his left side. Exhibit 4 at 2. He indicated that his voice was improving and that he was exercising a few times a week, sleeping better, and planning to visit Antarctica with his wife. *Id.* Noting improved exam results, the neurologist instructed Petitioner to "titrate down" his daily Gabapentin use. *Id.* at 5. It appears Petitioner's last refill of Gabapentin was obtained on March 28, 2020. Exhibit 9 at 5.

At a May 26th follow-up appointment regarding his DVT, the vascular surgeon noted "[c]hronic scarring" but no further evidence of DVT. Exhibit 3 at 11. He cautioned Petitioner to avoid the left arm for future central or peripheral lines or IVs and instructed him to discontinue his DVT medication. *Id.* Regarding his GBS illness, Petitioner indicated he "is still feeling like he is not back to normal but has made some progress. He complained of occasional shortness of breath. *Id.* at 12.

On August 10th, Petitioner visited the pulmonary clinic at Duke University, complaining of shortness of breath – especially when bending over (for example to tie his shoes). Reporting that he felt 90 to 95 percent recovered from his GBS, he stated that he could play tennis - but could not run on his heels, and could hold a note for only twelve seconds as contrasted with a previous duration of 20 seconds. Exhibit 8 at 16. Petitioner stated that he could play tennis "without feeling too short of breath." *Id.* at 17. Noted to have a minimal oxygen saturation of 95 percent and a rating of 1 on the Borg Dyspnea Scale,[14] Petitioner was assessed as having mild airflow obstruction – likely due to a weakened diaphragm. However, the pulmonologist theorized that it could reflect mild asthma. Exhibit 8 at 19; *see also id.* at 20-21 (several tested-related entries indicating a diagnosis of "mild persistent asthma without complication").[15] Petitioner was prescribed an inhaled corticosteroid and Albuterol. Exhibit 8 at 19-20.

When seen again on December 28th, Petitioner reported that he had stopped taking the inhaled corticosteroid because it caused hoarseness. Exhibit 8 at 44. He stated that he continued to experience some shortness of breath when playing tennis – which

---

[14] The Borg Dyspnea Scale is a "numerical score, [ranging from 0 to 10], used to measure dyspnea as reported by the patient during submaximal exercise and is routinely administered during six-minute walk testing." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5467923/ (last visited Feb. 8, 2023).

[15] It does not appear that Petitioner was diagnosed with COPD (chronic obstructive pulmonary disease) at this visit. It is mentioned only once in the following statement from the pulmonologist: "He has never been diagnosed with asthma/COPD in the past, but I wonder if his airflow obstruction is due to some mild asthma." Exhibit 8 at 19.

he was able to do three to four times a week, but not when singing. However, he complained that he was unable to hold a note for as long as he previously could. *Id.* At this visit, COPD was added as a diagnosis, along with the previous mild persistent asthma diagnosis. *Id.* at 41. Petitioner was prescribed a different medication and instructed to return within six months. *Id.* at 46.

Throughout January and early February 2021, Petitioner communicated with his pulmonologist on multiple occasions, attempting to find a medication with minimal side effects which would be covered by his insurance. Exhibit 8 at 59-83. He emailed the pulmonologist again in early April, asking to discontinue his medication because he believed it was interfering with his vision and ability to play tennis – noted to be competitive, at an ability level of 3.5 to 4.0.[16] Exhibit 8 at 85. In the email, he stated that his "breathing seems to be the least of my problems now." *Id.* The pulmonologist approved the proposed discontinuation of Petitioner's medication and plan to see his ophthalmologist. *Id.* at 84-85. No additional medical records have been filed.

Petitioner also has filed three personal affidavits, one affidavit from his wife, photographs prior to and after his illness, a damages summary, and damages and expense documentation. Exhibits 6, 11-18, 21-22, ECF Nos. 7, 16, 23, 28. These documents aligned with the information found in the medical records. Additionally, both parties filed documentation regarding Petitioner's tennis ranking and competitions. Exhibits 19-20, ECF No. 28; Exhibits A, Tabs 1-7, ECF No. 27.

In his third affidavit, Petitioner explained that tennis players are allowed to self-rate after reaching age 70. Exhibit 21 at ¶ 6. He maintained that, except for a brief period when he self-rated as 3.5 in order to qualify for a specific tournament, his rating was consistently 4.0 prior to his GBS illness. *Id.* at ¶¶ 6-9. Providing a letter from the leader of his team indicating he was moving to the position of substitute in May 2021, he stated that he played in only one tournament in 2021 post-vaccination – performing poorly, and planned to play in a tournament in 2022. *Id.* at ¶¶ 10-12;[17] *see* Exhibit 20 (email and team standing in May 2021). In his second affidavit, Petitioner indicated he had obtained a rating of 3.5 by February 2022. Exhibit 11 at ¶ 6, 3.

---

[16] Prior to and post-vaccination, Petitioner was rated at an ability level of either 3.5 or 4.0. According to the USTA (United States Tennis Association), "[a] rating is a number assigned to a player that reflects their level of playing ability . . . from 1.5 (beginner) through 7.0 (touring pro), which aligns with a set of general characteristics that break down the skills and abilities of each level, in 0.5 increments." https://www.usta.com/en/home/play/adult-tennis/programs/national/usta-league-faqs.html (last visited Feb. 9, 2023).

[17] This third affidavit was signed in July 2022. Exhibit 21 at 3.

### III. The Parties' Arguments

The parties agree Petitioner should be awarded $3,027.98 for past unreimbursed expenses. Petitioner's Memorandum in Support of Petitioner's Motion[18] for Findings of Fact and Conclusions in Law Regarding Damages ("Brief") at 1 n.1; Respondent's Brief on Damages ("Opp.") at 1 n.2, 13. Thus, the only area of disagreement is the amount of compensation which should be awarded for pain and suffering. Petitioner seeks $250,000.00 for his past pain and suffering, as well as $10,000.00 annually for future pain and suffering in the event that I award less than the requested past component - meaning the statutory cap would be met.[19] Brief at 25, 25 n.9. Respondent argues for an award of $119,500.00 for past pain and suffering, and no future award. Opp. at 1, 12-13.

To support the amounts he seeks, Petitioner asserted that his circumstances are similar to those suffered by the petitioners in seven published Program decisions involving past pain and suffering awards ranging from $155,000.00 to $250,000.00: *See generally Creely, Devlin, McCray, Wilson, Dillenbeck, Gross,* and *W.C.*[20] Brief at 12-13. Emphasizing his good health prior to contracting GBS, difficulties experienced during his eleven-day hospital stay – his hallucinations, complications related to the PICC line used to administer his plasmapheresis – his development of DVT, and ongoing symptoms – breathing difficulties and inability to walk on his heels, Petitioner maintained that "his case is most factually similar to *Creely, Devlin,* and *McCray.*" *Id.* at 25 (caselaw underlined, rather than italicized as in the original). Of the cases Petitioner cited, only *Dillenbeck* included an award for future pain and suffering. *Dillenbeck*, 2019 WL 4072069, at *15.

In contrast, Respondent argued that Petitioner's past pain and suffering was not

---

[18] Petitioner has not filed a motion with this request. Instead, I ordered damages briefing after Petitioner informed me that the parties had reached an impasse. Status Report, Apr. 14, 2022, at ¶ 6, ECF No. 24.

[19] In the Vaccine Act, Congress dictated that any actual and projected pain and suffering award should not exceed $250,000. Section 15(a)(4).

[20] Listed in order of past pain and suffering award, from largest to smallest: *Creely v. Sec'y of Health & Hum. Servs.,* No. 18-1434V, 2022 WL 1863921 (Fed. Cl. Spec. Mstr. Apr. 27, 2020) (awarding $250,000.00 for actual pain and suffering); *Devlin v. Sec'y of Health & Hum. Servs.,* No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) (awarding $180,000.00 for actual pain and suffering); *McCray v. Sec'y of Health & Hum. Servs.,* No. 19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $180,000.00 for actual pain and suffering); *Wilson v. Sec'y of Health & Hum. Servs.,* No. 20-0588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021) (awarding $175,000.00 for actual pain and suffering); *Dillenbeck v. Sec'y of Health & Hum. Servs.,* No. 17-0428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (a decision I issued awarding $170,000.00 for past pain and suffering and $10,857.15, the net present value of payments of $5,000.00 per year for 22 years); *Gross v. Sec'y of Health & Hum. Servs.,* No. 19-0835V, 2021 WL 2666685 (Fed. Cl. Spec. Mstr. Mar. 11, 2021), *review denied,* 154 Fed. Cl. 109 (2021) (awarding $160,000.00 for actual pain and suffering); *W.B. v. Sec'y of Health & Hum. Servs.,* No. 18-1634V, 2020 WL 5509686 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) (awarding $155,000.00 for actual pain and suffering).

as severe as that described in *Dillenbeck*, involving an award of $170,000.00, or four other published Program decisions involving awards ranging from $155,000.00 to $180,000.00: *Johnson, Fedewa, Setaro,* and *Nelson*.[21] Opp. at 10-12. He insisted that Petitioner's hospitalization and treatment "indicate[d] a far less severe course" than that experienced by the petitioners in *Dillenbeck, Johnson, and Fedewa. Id.* at 10. Noting that the *Serato* petitioner had difficulties golfing after his illness, Respondent argued that Petitioner's tennis abilities were not as limited as he claimed. *Id.* at 10-12 (citing Petitioner's prior and current rankings). Contrasting Petitioner's recovery with that of the *Nelson* petitioner – who continued to experience difficulties walking during and after his inpatient rehabilitation, Respondent insisted his proposed amount of $119,500.00 - $35,500.00 lower than the *Nelson* petitioner's award, is appropriate. *Id.* at 12. He maintained that "because [P]etitioner has failed to show that his residual symptoms would have a significant effect on him in the future, he should not be awarded future pain and suffering." *Id.* (citing *Devlin*, 2020 WL 5512505, at *4).

In his responsive brief, Petitioner disagreed with Respondent's assertion that Petitioner's circumstances "demonstrates a *less severe* course of GBS." Petitioner's Memorandum in Response to Opp. ("Reply") at 2-3 (emphasis in the original). He maintained that Respondent had incorrectly stated important facts related to his symptoms, treatment, and current abilities. Providing documentation regarding his difficulties playing tennis at his previous level, his third affidavit, and an affidavit from his wife, Petitioner stressed that he continues to experience breathing difficulties which interferes with his ability to play tennis and sing in the choir and an inability to walk on his heels. *Id.* at 3-4; *see* Exhibits 19-22, ECF No. 28.

### IV.     Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents.

---

[21] Listed in order of past pain and suffering award, from largest to smallest: *Johnson v. Sec'y of Health & Hum. Servs.,* No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for actual pain and suffering); *Fedewa v. Sec'y of Health & Hum. Servs.,* No.17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020) (awarding $180,000.00 for past pain and suffering); *Setaro v. Sec'y of Health & Hum. Servs.,* No. 16-135619-0207V, 2021 WL 1440207 (Fed. Cl. Spec. Mstr. July 20, 2021) (awarding $160,000.00 for actual pain and suffering); *Nelson v. Sec'y of Health & Hum. Servs.,* No. 17-1747V, 2021 WL 754856 (Fed. Cl. Spec. Mstr. Jan. 13, 2021) (awarding $155,000.00 for actual pain and suffering).

I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases.[22] However, I ultimately base my determination on the circumstances of this case.

The evidence shows that Petitioner overall suffered a moderate GBS illness – requiring an eleven-day hospitalization, only two days of inpatient rehabilitation, and 45 days of outpatient rehabilitation. His initial symptoms were mild, and he was able to walk – with either little or no assistance throughout his GBS illness. Although he believed he may be suffering from a stroke when he first visited the ER on January 18th, the ER physician quickly ruled out this possibility – considering instead differential diagnoses of TM and GBS. The tentative GBS diagnosis was confirmed the next day by the neurologist – who specified Petitioner was suffering from AIDP.

No doubt the complications Petitioner experienced due to the administered PICC line and subsequent DVT, increased his suffering. However, most of Petitioner's symptoms had resolved by May 2020 – less than five months post-vaccination. By August 2020, Petitioner no longer was experiencing any DVT-related symptoms. He experienced only a mild shortness of breath which slightly interfered with, but did not prevent him from, playing tennis and singing in the choir, and an inability to heel walk. By December 2020 – less than a year post-vaccination, Petitioner was playing tennis three to four times a week.

The *Creely* case cited by Petitioner - involving a past pain and suffering award equivalent to the amount he seeks: $250,000.00 - does not constitute a reasonably-comparable case. The *Creely* petitioner suffered GBS after receiving a flu vaccine while still hospitalized and two days following a total knee replacement. *Creely*, 2022 WL 1863921, at *10. Thus, he was forced to struggle with the effects of his GBS illness while recovery from this surgery. For five years, he experienced significant consequences of his illness, including multiple falls - resulting in two ER visits and one instance of broken ribs. Unable to climb the stairs in his home, he was forced to sleep in a hospital bed on the first floor and was unable to bath or shower in his bathroom – located on the second

---

[22] Statistical data for all GBS cases resolved in SPU by proffered amounts from inception through January 1, 2023 reveals the median amount awarded to be $170,000.00. The awards in these cases - totaling 261, have typically ranged from $125,196.11 to $250,000.00, representing cases between the first and third quartiles and awards comprised of all categories of compensation – including lost wages. 33 cases include the creation of an annuity to provide for future expenses.

Past pain and suffering amounts awarded in substantive decisions issued in 21 SPU GBS cases range from $125,000.00 to $192,500.00, with an additional case involving annuity payments. The median amount award in these 22 cases was $165,000.00. Awards in cases falling with the first and third quartiles range from $155,000.00 to $180,000.00.

floor. *Id.* The *Creely* petitioner also encountered significant difficulties operating the pizza business he and his wife owned. *Id.* at *10-11.

In contrast to *Creely,* the cases involving past pain and suffering awards ranging from $170,000.00 to $180,000.00 offer better comparisons – but they too reflect slightly worse circumstances than what Petitioner has experienced. The *McCray, Devlin,* and *Wilson* petitioners all required a greater quantity of inpatient and outpatient rehabilitation – involving intubation for the *Wilson* petitioner. *McCray,* 2021 WL 4618549, at *2; *Devlin,* 2020 WL 5512505, at *3; *Wilson,* 2021 WL 5143925, at *1-2. And the *McCray* and *Wilson* petitioners were still using a walker and wheelchair, respectively upon discharge. *McCray,* 2021 WL 4618549, at *2; *Wilson,* 2021 WL 5143925, at *1-2. The *Devlin* petitioner's suffering was significantly increased by his anxiety – as evidenced by a significant weight loss, due to the month-long uncertainty surrounding his diagnosis. *Devlin,* 2020 WL 5512505, at *3.

The petitioners' recoveries in these cases were slower than that experienced by Petitioner. The *McCray* and *Dillenbeck* petitioners were unable to continue their previous employment, and the *Devlin* petitioner was unable to resume his usual activities of tennis and pickleball. *McCray,* 2021 WL 4618549, at *2; *Dillenbeck,* 2019 WL 4072069, at *2, 11; *Devlin,* 2020 WL 5512505, at *3, 3 n.12. All showed significant residual effects more than one-year post-vaccination, and the *McCray* and *Dillenbeck* petitioners' illnesses lasted several years. *McCray,* 2021 WL 4618549, at *2; *Dillenbeck,* 2019 WL 4072069, at *2; *Devlin,* 2020 WL 5512505, at *3, 3 n.12; *Wilson,* 2021 WL 5143925. Years after the onset of her GBS illness, the *McCray* petitioner continued to use a cane and "take a number of medications to treat her nerve pain and asthma." *McCray,* 2021 WL 4618549, at *4.

Respondent's cited cases – *Serato* and *Nelson* - offer the best comparisons, but he has not provided sufficient evidence to demonstrate Petitioner's past pain and suffering award should be significantly lower, as argued. Like the Petitioner in this case, the *Nelson* petitioner suffered symptoms which were initially mild, along with the later complication of numerous falls. *Nelson,* 2021 WL 754856, at *2-3. The *Serato* petitioner was also retired and was able to resume his golfing hobby, although he continued to experience difficulty gripping the club. *Serato,* 2021 WL 1440207, at *4.

As I previously have explained in decisions and at expedited "Motions Day" hearings, GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically-alarming injury, such as SIRVA. *E.g., McCray,* 2021 WL 4618549, at *4. Thus, Petitioner's past pain and suffering award should be greater than the $119,500.00 proposed by Respondent. Petitioner's proposed amounts, however, are inflated. Weighing all of the above, I find that the severity

11

and duration of Petitioner's GBS symptoms warrant the same past pain and suffering amount awarded in *Nelson* - **$155,000.00**.

Regarding future pain and suffering, Petitioner has not shown that the residual symptoms he continues to suffer will have as significant an effect on him in the future. Nor is their evidence in this record of a truly permanent injury disability (beyond the usual lingering sequelae, which I can address, and do, in the size of my award for actual pain and suffering). Thus, I do not find that an award for future pain and suffering is warranted in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $155,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.[23] I do not find that an award for future pain and suffering is warranted in this case.**

**I therefore award Petitioner a lump sum payment of $158,027.98, representing $155,000.00 for his actual pain and suffering and $3,027.98 for his actual expenses in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[24]

**IT IS SO ORDERED.**

> <u>s/Brian H. Corcoran</u>
> Brian H. Corcoran
> Chief Special Master

---

[23] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.